312 A.2d 211.

S. RITA KELLY *vs.* DR. AARON GERSHKOFF.

DECEMBER 12, 1973.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Powers, JJ.

508

ROBERTS, C. J. This civil action was brought to recover damages alleged to have resulted from the defendant's negligence in performing dental services for the plaintiff. The cause was tried to a justice of the Superior Court with a jury, which returned a verdict for the defendant. Thereafter, the trial justice granted the plaintiff's motion for a new trial, and the defendant is in this court prosecuting an appeal from the order entered thereto. The only question before us is whether the trial justice erred in granting the plaintiff's motion for a new trial.

The evidence discloses that plaintiff had a long history of dental travail. In 1956 she had all of her upper teeth extracted and was fitted with a conventional upper denture. This device, however, proved unsatisfactory, and, after wearing it for two years, she consulted another dentist, Dr. Norbert L. Raemer. Doctor Raemer also installed a conventional upper denture, which plaintiff wore for some eight years although not satisfied because it fitted loosely. Eventually, in 1965, Dr. Raemer told plaintiff that it was practically impossible to fit her with a conventional denture, but he did mention a doctor in Providence, later identified as defendant, as one who might be able to help her.

The plaintiff visited defendant in January of 1967. At that time he told plaintiff about the subperiosteal implant that he said he had been using successfully since 1948. The plaintiff said that defendant had told her there was a permanence about this type of implant. The defendant, however, testified that he had warned her of the risk involved. In any event, plaintiff agreed to have such a subperiosteal implant installed by defendant at an overall expense of $1,500.

The implant was installed in two stages. The first, described by defendant as preparatory, consisted in incising the gum tissue and folding it back so as to expose the bone, of which an impression was made. The gum tissue was then sutured and the impression forwarded to the laboratory where the prosthetic implant was made so as to conform to the impression. Once the prosthetic implant was made, the gum tissue was again opened, the prosthetic was fitted onto the bone, and the gum tissue resutured over the implant.[1]

On February 6, 1967, plaintiff underwent the preparatory procedure without incident. Neither was there any apparent difficulty when the implant was installed on March 3, 1967. However, shortly thereafter, on April 18, 1967, plaintiff developed an infection which required treatment. Such infection, according to defendant, resulted from an impingement on the gum tissue by a temporary roofless denture[2] which had been attached to the posts at the completion of

---

[1] A detailed description of the prosthetic implant is unnecessary. Suffice it to note that it is a one-piece prosthetic device made of vitalium, generally horseshoe in shape, with four posts which, after implantation, protrude vertically through the gum tissue. A roofless denture or row of teeth is then attached to these posts.

[2] As heretofore narrated, a roofless denture or row of teeth is attached to the posts, but pending completion of a permanent denture a temporary denture is affixed for aesthetic purposes.

the second stage in the installation. Whatever the cause, the infection in question appears to have responded to treatment and had completely healed when the permanent denture was installed in plaintiff's mouth on May 15, 1967. At this point plaintiff was pleased with the apparent success of her implant.

Shortly thereafter, however, plaintiff began a history of upper jaw infections, which resulted in a number of visits to defendant. The last such visit of which defendant kept any record occurred on August 28, 1967, but the record establishes that plaintiff went to his office on an average of twice a month through the remainder of 1967. Additionally, plaintiff during this period consulted with defendant by telephone on a number of occasions. All such visits and calls were made by plaintiff to advise defendant of the difficulty she was having. Even so, from the end of August to the end of the year, defendant, according to plaintiff, continuously advised her that she was making progress.

Notwithstanding this assurance, plaintiff was becoming increasingly disturbed, and on November 21, 1967, consulted Dr. George Denicourt, a specialist in oral surgery. His examination inclined him to the belief that the implant should come out. The plaintiff, however, was reluctant because of the expenditure of money and time involved. She told Dr. Denicourt that she had hoped he might be able to save the implant. Doctor Denicourt agreed to try but gave her little encouragement. Accordingly, he prescribed massive doses of an antibiotic, specifically lincocin, with temporary positive results. However, the infection recurred, and on December 8, 1967, Dr. Denicourt was convinced that the implant would have to come out. Consequently, he arranged to have plaintiff admitted to the hospital, where on January 22, 1968, the implant was removed.

Initially, the complaint was in three counts, one alleging negligence in the implantation procedure, the second alleg-

ing negligent treatment thereafter, and the third alleging failure to fully perform his agreement with plaintiff. At the close of the evidence, defendant moved for a directed verdict on each count. It then appeared that conflicting evidence had been adduced on the question of whether plaintiff agreed to the implantation procedure under an impression that it would be permanent. The plaintiff thereupon moved, pursuant to Super. R. Civ. P. 15(b), to amend her complaint to include a count charging "* * * failure of the Defendant to properly warn the Plaintiff of the risk involved."[3]

The trial justice granted plaintiff's motion to amend and denied defendant's motion for a directed verdict. In submitting the case to the jury, he charged, in part, as follows: "A person in the position such as the Defendant with superior knowledge has the duty and obligation of disclosing the known risk to the Plaintiff before he performs his operational procedure." He then went on to charge that if the jury found that defendant did not disclose the known risk to plaintiff, they were to find him guilty of negligence. If, on the other hand, they found that defendant did disclose the known risk to plaintiff prior to the implantation, they were to find him not guilty of negligence.

The decision discloses that the trial justice concluded on evidence adduced that it was known in the profession that such implantations frequently resulted in the development of infections, which would ultimately require a removal of the implant. In this respect he directs attention to evidence that there would be, after an implant in the upper jaw, as

---

[3]For a comprehensive and enlightening discussion of the informed consent doctrine, see *Wilkinson* v. *Vesey*, 110 R. I. 606, 295 A.2d 676 (1972). There this court held that where an action is based upon an alleged failure by a physician to adequately disclose the risks and alternatives of a proposed diagnostic, therapeutic or surgical procedure, the action sounds in negligence.

here, an absorption of the maxilla bone and that if any space occurs between the prosthetic and that bone bacteria would accumulate and result in such an infection.

From this he concluded that there was a known risk that the infection which frequently followed such installations would require a removal of the implant, probably in about four years. He then went on to say: "This Court feels that this Defendant being a professional man dealing with the lay person, the Court does not accept his testimony as to his warning. If he wanted to properly warn this woman, being a professional man, I feel that under the circumstances he would necessarily draw up a written instrument and have the Plaintiff sign the thing, sign the document as this case comes close to an assault and battery upon the person of the Plaintiff and if not, a fraud committed upon the person of the Plaintiff." He then held that he had no alternative but to grant plaintiff's motion for new trial.

It is well settled that a trial justice, in passing on a motion for new trial, is required in an exercise of his independent judgment to consider the weight and credibility to be given the evidence adduced through the parties. *Barbato* v. *Epstein,* 97 R. I. 191, 196 A.2d 836 (1964). There is little doubt that the trial justice here complied with that obligation. Where that is so, the party seeking to overrule the decision of the trial justice must establish that he was clearly wrong in reaching that decision in that he either overlooked or misconceived relevant and material evidence on a controlling issue. *Labbe* v. *Hill Bros.,* 97 R. I. 269, 197 A.2d 305 (1964). It is our opinion that defendant has shown that the trial justice here was clearly wrong in that he misconceived the probative force of defendant's testimony as to the manner in which defendant had informed plaintiff of the known risk of infection subsequent to the implantation and the probability of the necessity for the removal thereof.

In considering the motion, the trial justice concluded that he could not "accept" the testimony of defendant on that issue. He explained that he was not accepting that testimony because "I feel that under the circumstances" a professional man would have reduced to writing the information designed to inform the patient of the known risk. Significantly, there is no evidence in the record tending to prove that any such standard is recognized by the dental profession. The observation of the trial justice is merely his reason for not accepting defendant's testimony, which, unless rejected on the grounds of lack of credibility, has probative value. However, what is really pertinent here is that the trial justice clearly misconceived the probative force of defendant's testimony as to the manner in which defendant had informed plaintiff of the known risk and for that reason must be held to have been clearly wrong.

The trial justice having misconceived material evidence, it becomes our duty as an appellate court to examine the record in order to determine if the evidence, as we view it, strongly preponderates against the verdict. In undertaking to so determine, we do not weigh the evidence or pass on the credibility of the witnesses. It is our obligation to look at the record and determine therefrom whether there is any competent evidence which, if believed, would support the jury's finding. *Molleur* v. *City Dairy, Inc.,* 110 R. I. 58, 290 A.2d 214 (1972); *Gilbert* v. *Girard,* 109 R. I. 68, 279 A.2d 919 (1971). Pursuant to this rule, we have examined all of the evidence and, in particular, that of the defendant concerning the manner in which he informed the plaintiff of the known risk here involved. We are satisfied, after such examination, that the testimony adduced through the defendant, if believed, would support the verdict and, consequently, we will not disturb the verdict of the jury.

The appeal of the defendant is sustained, and the case is

remitted to the Superior Court for entry of judgment on the verdict.

Mr. Justice Powers, to whom the case was originally assigned for the writing of an opinion, took a different view of the trial justice's decision than that expressed in the filed opinion of this court. However, because he retired before the decision of this court was made public, he saw no purpose to be served in having his view recorded.

Mr. Justice Doris did not participate.

*John F. McBurney, Joseph S. Gendron,* for plaintiff.

*Gunning, LaFazia, Gnys & Selya, Edward L. Gnys, Jr., Hinckley, Allen, Salisbury & Parsons, George M. Vetter, Jr.,* for defendant.